# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **CLAUDINE WILLIAMS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:09-CV-02689-AJB** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | |
| ***Commissioner of Social*** | : | |
| ***Security Administration,*** | : | |
| | : | |
| **Defendant.** | : | |

## ORDER AND OPINION[1]

Plaintiff Claudine Williams ("Plaintiff") brought this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act ("the Act").[2]  For the reasons below, the

---

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  [*See* Dkt. Entry dated 10/23/2009].  Therefore, this Order constitutes a final Order of the Court.

[2]    Title II of the Social Security Act provides for federal disability insurance benefits.  42 U.S.C. § 401 *et seq*.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for supplemental security income benefits for the

undersigned **REVERSES** the final decision of the Commissioner and **REMANDS**

Plaintiff's case to the Commissioner for further consideration of Plaintiff's claims.

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on June 26, 2007, alleging disability

commencing on October 18, 2006.  [Record (hereinafter "R") 110, 114].  Plaintiff's

applications were denied initially and on reconsideration.  [*See* R55-58, 59-62, 67-69].

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R75].

An evidentiary hearing was held on February 19, 2009.  [R19-44].  The ALJ issued a

decision on March 26, 2009, denying Plaintiff's application on the ground that she was

not "disabled."  [R18].  Plaintiff sought review by the Appeals Council, and included

additional evidence that was not presented to the ALJ.  [*See* R4].  The Appeals Council

---

disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)). Under 42 U.S.C. § 1383(c)(3), the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim. Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

2

accepted this evidence but denied Plaintiff's request for review on July 24, 2009, making the ALJ's decision the final decision of the Commissioner. [R1-4].

Plaintiff then filed an action in this Court on September 18, 2009, seeking review of the Commissioner's decision. *Claudine Williams v. Michael J. Astrue, Commissioner of Social Security*, Civil Action File No. 1:09-cv-02689-AJB. [*See* Doc. 2]. The answer and transcript were filed on January 28, 2010, [*see* Docs. 7 and 8]; Plaintiff's initial brief was filed on April 5, 2010, [Doc. 12]; Defendant filed a supplemental transcript on April 23, 2010, [Doc. 13], and filed its own brief on May 7, 2010, [Doc. 14]; Plaintiff filed her reply brief on May 17, 2010, [Doc. 15]; and the Court heard oral arguments, [*see* Doc. 16]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.    STATEMENT OF FACTS

### A.    *Factual Background*

Plaintiff was born on July 30, 1960, and was 48 years old at the time of the administrative evidentiary hearing. [R26]. She has a high school education, [R27], and she has past relevant work as a housekeeper, [R16, 38], both in a hotel/motel setting

3

and in a dormitory, [R38]. Plaintiff alleges disability due to back pain, depression, and high blood pressure. [Doc. 12 at 2 (citing R28-29)].

### B.   *Medical Records Before the ALJ* **[R190-564]**

Plaintiff alleges disability beginning October 18, 2006, [R110, 114], when she hurt her back at work while lifting a mattress.[3] [R222, 230]. She filed a workers' compensation claim and received treatment from Dr. Singh, who noted that her back condition failed to respond to conservative treatments such as physical therapy, non–steroidal anti-inflammatory drugs (NSAIDs), or muscle relaxants. [*See* R220, 222]. Dr. Singh was "concerned that if she doesn't get MRI and appropriate treatment then pt may suffer long term disability." [R194].

_____

[3]      Previously, on December 25, 1999, Plaintiff went to the emergency room at Decatur General Hospital for wrist pain. [R190-91]. Blood pressure readings of 156/105 and 166/105 were recorded. [*Id.*]. Further, in May 2005, Plaintiff received treatment from Physician's Assistant ("PA") Wilson, Dr. Eddie Whitehead's PA, for low-back pain. [R334]. She complained of "constant, severe, sharp, throbbing, and aching" pain radiating to the buttocks. [R333]. The pain was aggravated by bending over and twisting, though she noted some pain relief with rest, heat, and muscle relaxants. [*Id.*]. The notes for her musculoskeletal system indicate "decreased ROM with back flexion, extension, and lateral flexion; pain with back flexion,[] extension, and lateral flexion." [R334]. Her blood pressure was 146/101. [*Id.*]. Psychiatric examination was normal, but she was taking Lexapro (used to treat depression and generalized anxiety disorder). [*Id.*]. PA Wilson advised that she had a severe back strain, injected her with Toradol (a pain reliever often used post-surgery), and instructed her not to lift more than 20 to 30 pounds for two weeks. [R216, 334, 463].

A November 18, 2006, lumbar MRI[4] showed abnormalities at L3-L4, L4-L5, and L5-S1. [R204]. Plaintiff was diagnosed with multilevel disc disease "including protrusions, shallow extrusions, and annular tears . . . . No levels show high grade canal or foraminal stenosis."[5] [R204 (capital letters lower-cased)]. Notes from an October 18, 2006, visit to Concentra Medical Center indicate an antalgic gait,[6] [R250], and Dr. Brownlee's notes from a November 20, 2006 visit indicate decreased range of motion in the lumbar spine, with flexion, extension, and side bending limited with pain to 45 degrees, 10 degrees, and 30 degrees, respectively, [R230]. During visits in October and November 2006, Dr. Brownlee diagnosed lumbar strain, ordered lifting avoidance and physical therapy, and prescribed medications for pain and muscle relaxation. [R237, 243, 245, 255, 263, 267, 271]. Another Concentra physician,

---

[4]    A lumbar magnetic resonance imaging scan is a non-invasive way to create detailed pictures of the part of the spine that runs though the lower back. *See* MedlinePlus, Lumbar MRI scan, http://www.nlm.nih.gov/medlineplus/ency/article/007352.htm (last visited 03/10/11).

[5]    Spinal stenosis causes narrowing of the spine, which puts pressure on the nerves and spinal cord and can cause pain. *See* MedlinePlus, Spinal Stenosis, http://www.nlm.nih.gov/medlineplus/spinalstenosis.html (last visited 03/10/11).

[6]    An antalgic gait is a limp adopted so as to avoid pain. *See* The Free Online Medical Dictionary, Antalgic Gait, http://medical-dictionary.thefreedictionary.com/antalgic+gait (last visited 03/10/11).

5

Dr. Tracy Nailor, reviewed Plaintiff's MRI results on December 1, 2006, and she diagnosed lumbar radiculopathy[7] and "Disc herniation, multiple," told Plaintiff to do no lifting, and directed Plaintiff to consult an orthopedic surgeon.  [R227, 292].

In December 19, 2006, treatment notes, Dr. Herndon Murray of the Peachtree Orthopaedic Clinic indicated that x-rays of Plaintiff's lumbar spine did not show any evidence of injury.  [R293].  He recommended replacing her hydrocodone[8] with ibuprofen,[9] and he recommended physical therapy and a home exercise program. [R293].  The treatment notes for a January 2, 2007, follow-up appointment indicate that Plaintiff "complains of a lot of tenderness to even light palpation[[10]] of the lumbar

[7]     Lumbar radiculopathy is an alternate name for a herniated (slipped) disk, which occurs when all or part of a spinal disk is forced through a weakened part of the disk, placing pressure on nearby nerves.  *See* MedlinePlus, Herniated disk, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited 03/11/11).

[8]     Hydrocodone is a narcotic that relieves pain and coughing. *See* MedlinePlus, Hydrocodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited 03/11/11).

[9]     Ibuprofen is an NSAID used to relieve pain, tenderness, swelling, and stiffness.  *See* MedlinePlus, Ibuprofen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html (last visited 03/11/11).

[10]     Palpation is a method of feeling with the hands during a physical examination. *See* MedlinePlus, Palpation, http://www.nlm.nih.gov/medlineplus/ency/article/002284.htm (last visited 03/11/11).

6

spine, more so than would typically be expected." [R294]. Examining the MRI,

Dr. Murray stated:

> I do not feel that the MRI reflects "disk herniation, multiple," as she was advised at Concentra, but I feel that she does have some modest degenerative changes in multiple lumbar intervertebral disk spaces with some disk de[sicc]ation,[11] annular bulging, and a couple of high-intensity zones, all of which I think are degenerative changes and not associated with acute trauma.
>
> These changes clearly are not indications for any surgery.

[R294]. Dr. Murray prescribed Ultram[12] for pain because ibuprofen had been

ineffective, [R294], and wrote that "[e]verything about the case indicates to me a

prolonged course and perhaps an incomplete recovery, and I think that the overall

prognosis for recovery is going to be multifactorial . . . ." [R294]. He authorized

Plaintiff to "continue working on light duty with no lift, push, or pull over 20 pounds

and no excessive bend or twist." [R295; *accord* R307].

_____

[11]    Desiccation is the complete or nearly complete deprivation of moisture. *See* Merriam-Webster Medical Dictionary, Desiccation, http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va=sample (last visited 03/11/11).

[12]    Ultram (tramadol) is used to relieve moderate to moderately severe pain. *See* MedlinePlus, Tramadol, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited 03/11/11).

AO 72A
(Rev.8/8
2)

The notes for Plaintiff's January 16, 2007, visit with Dr. Murray indicate that "[s]he still needs authorization for and direction for physical therapy," and that there was no reason for him to see her again until she was authorized and had completed the therapy. [R296]. The notes for her February 16, 2007, visit state that she exhibited "a lot of pain behavior in general," but that "[o]n inspection of her back, . . . there is a lot of tenderness without objective findings." [R297]. Dr. Murray further stated that "[h]er manual muscle test is totally noncredible. Even in the upper extremities, she just does not make an effort against resistance. Unfortunately, this impacts her credibility on all her subjective symptoms." [R297]. Dr. Murray agreed that Plaintiff had degenerative disc disease, but he thought it was age-related and not excessive, and that the pain of the degree she experienced was "not readily explainable." [R297]. He maintained the same work restrictions as before but noted that Plaintiff "apparently has no job to go back to." [R297]. Because Ultram had been ineffective, Dr. Murray prescribed Naprosyn[13] and recommended an epidural steroid injection.[14] [R297].

---

[13]     Naprosyn (naproxen) is used to relieve pain, tenderness, swelling, and stiffness. *See* MedlinePlus, Naproxen, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited 03/11/11).

[14]     An epidural injection is delivered into the epidural space of the spine to provide temporary or prolonged relief from pain or inflammation. *See*

AO 72A
(Rev.8/8
2)

On February 26, 2007, Plaintiff was seen by another orthopedist, Dr. Kenneth Mautner.  [R336].  She reported pain in her back and legs, difficulty walking, and a pain level of eight out of ten at best.  [R336].  Her sitting, standing, and walking tolerance was fifteen minutes.  [R337].  Lying on her right side helped relieve the pain, but hot packs, ice, and physical therapy had not.  [R337].  She could flex 20 degrees and extend 10 degrees, but this caused severe pain.  [R337].  She had tenderness at the midline around S1 and in the paraspinal[15] muscles.  [R337].  Strength was 5/5 in her lower extremities and 4/5 on the right quadriceps.  [R337].  Reflexes were normal in the knees and ankles but the medial hamstring reflex could not be detected.  [R337].  There was a patchy distribution of diminished light touch over her foot, but she had sensation everywhere else.  [R337].

Dr. Mautner reviewed the MRI and stated that he found what appeared to be an annular tear and mild disc bulge at the L4-L5 level, though he said there was "certainly" room for both of her L5 nerve roots to exit.  [R337].  Dr. Mautner

---

RadiologyInfo.org, Epidural Injections, http://www.radiologyinfo.org/en/info.cfm?PG=epidural (last visited 03/11/11).

[15] Paraspinal means adjacent to the spinal column.  *See* Merriam-Webster Medical Dictionary, Paraspinal, http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va=sample (last visited 03/11/11).

AO 72A
(Rev.8/8
2)

concluded that Plaintiff's lack of motion and pain exceeded any structural findings, and that her behaviors "are fear avoidance and not wanting to move in certain directions." [R338].  He recommended being active, more physical therapy, and a functional restoration program.  [*See* R338].  Regarding medications, he stated that "we could consider" neuropathic[16] pain relievers to combat the leg pain, and he said it would be reasonable to try an L5 nerve root block, though he believed that most of her pain was "not directly related to any true neural compression."  [R338].  On March 7, 2007, Plaintiff received an epidural from Dr. David Schiff that reduced her pain post-procedure from 8/10 to 0/10.  [R356].  Dr. Schiff noted that Plaintiff would follow up with Dr. Murray.  [R356].

On March 26, 2007, Plaintiff saw a spine specialist, Dr. Christopher Edwards, at the Atlanta Neurological and Spine Institute.  [R412].  Plaintiff stated her symptoms were worse than before, that she was in unbearable pain (back at 8/10), and that her spinal symptoms are worsened by sitting, driving, bending forward, lying flat, walking, standing, twisting, bending, and lifting.  [R412].  She could not sit for more than half

---

[16]     Neuropathic pain – otherwise known as nerve pain – is a type of chronic pain that occurs when nerves in the central nervous systems become injured or damaged.  *See* American Chronic Pain Association, Neuropathic pain, http://www.theacpa.org/conditionDetail.aspx?id=29 (last visited 03/11/11).

AO 72A (Rev.8/8 2)

an hour or stand for more than ten minutes.  [R413].  Even when taking medicine or

applying heat or ice, she could only sleep for four hours.  [R413].  There was no

indication of tenderness from palpation of the lumbar spine.  [R413].  No pain was

produced using straight leg raising tests, femoral[17] stretch tests, a medial leg rotation

test, a foot dorsiflexion test, or a neck flexion test.  [R414].  However, reflexes were

diminished in the Achilles and patella, and motor tests revealed some abnormal findings

at the right hip, knee, foot, and toe.  [R414].  Dr. Edwards ordered Williams not to work

until electromyography[18] ("EMG") studies and a CT myelogram[19] could be performed.

[*See* R396].  Also on March 26, 2007, Plaintiff saw Dr. Philip Wiltz (a colleague of Dr.

Edwards).  [R410].  The notes indicate that Plaintiff had weak abductors, "floppy" big

---

[17]       Femoral means of or relating to the femur or thigh.  *See* Merriam-Webster Medical Dictionary, Femoral, http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va=sample (last visited 03/11/11).

[18]       Electromyography measures the response of muscles and nerves to electrical activity.  It is used to help determine muscle conditions that might be causing muscle weakness, such as nerve disorders.  *See* KidsHealth, Electromyography, http://kidshealth.org/parent/general/sick/emg.html (last visited 03/11/11).

[19]       A computed tornography myelogram is a detailed picture of the spinal cord and spinal column.  *See* RadiologyInfo.org, Myelography, http://www.radiologyinfo.org/en/info.cfm?pg=myelography (last visited 03/11/11).

AO 72A
(Rev.8/8
2)

toe, and a subtotal foot drop[20] on the right side.  [R410].  Dr. Wiltz also indicated that Plaintiff "is still totally disabled from gainful employment."  [R410].

The EMG studies were performed on April 2, 2007, by Dr. Christopher Taylor, and the results were normal.  [R422].  On an April 9, 2007, follow-up with Dr. Wiltz, the notes indicate that Plaintiff had foot drop on the right side, and that a straight leg raising test was positive.  [R408].  At the April 16, 2007, follow-up, Dr. Edwards ordered physical therapy.  [R382, 407].  On April 23, 2007, a lumbar myelogram and lumbar CT myelogram were performed, showing – among other things – retrolisthesis[21] at L2-3 and L3-4; degenerative bulging and a more pronounced ventral extradural defect at L2-3; disc herniation at L5-S1; and disc herniation at L3-4 that was eccentric to the left and compressed the L4 nerve root.  [R375].  In his treatment notes for the April 30, 2007, follow-up, Dr. Edwards said these results "can explain some of the nerve involvement, but it doesn't explain everything."  [R379].  He felt that Plaintiff

---

[20]   Foot drop describes the inability to raise the front part of the foot due to weakness or paralysis of the muscles that lift the foot.  *See* National Institute of Neurological Disorders and Stroke, Foot Drop, http://www.ninds.nih.gov/disorders/foot_drop/foot_drop.htm (last visited 03/11/11).

[21]   Retrolisthesis is backward slippage of one vertebra onto the vertebra immediately below.  *See* The Free Online Medical Dictionary, Retrolisthesis, http://medical-dictionary.thefreedictionary.com/retrolisthesis (last visited 03/11/11).

AO 72A
(Rev.8/8
2)

could do sedentary work.  [R395].  For the May 18, 2007, follow-up, the notes indicate that the foot drop was resolved but that Plaintiff still suffered from severe back pain, which Dr. Edwards found "very difficult to kind of explain."  [R404].  He thus recommended that Plaintiff get a second opinion from a Dr. Hal Silcox or Dr. Scott Erwood.  [R404].

Plaintiff was treated at various times by Jerry Wilson, a PA at Georgia Internal Medicine Care Associates who was supervised by Dr. Eddie Whitehead.  [R457-64]. On May 5, 2005, she was listed as taking Lexapro and had a blood pressure of 146/101. [R462-63].  For her March 5, 2007, visit, Lotrel[22] was listed as a current medication, and she was prescribed Vicodin[23] and an injection.  [R460-611].  PA Wilson noted that a review of Plaintiff's blood pressure logs revealed "systolics in the 150s and diastolics in the 90s."  [R458].  For her June 22, 2007, visit, the notes indicate the following:

> Stress details: her anxiety disorder was originally diagnosed 4 years ago. Her symptom complex includes apprehension, chest pain, and

---

[22]     Lotrel contains amlodipine besylate and benazepril hydrochloride, which in combination are used to treat high blood pressure. *See* MedlinePlus, Amlodipine and Benazepril,  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601018.html  (last visited 03/13/11).

[23]     Vicodin is a brand name for hydrocodone.  *See* MedlinePlus, Hydrocodone, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited 03/13/11).

AO 72A
(Rev.8/8
2)

palpitations.  True panic attacks apparently do not occur.  The frequency symptoms is nearly every day.  Apparent triggers include occupational stressors and family stress.  She is not currently being treated for anxiety. Previous attempts at treatment have included antidepressants an SSRI antidepressant and Paxil.

[R458].

On August 15, 2007, a medical consultant estimated Williams was generally capable of light exertion, with some postural limitations.  [*See* R482-83].

For Plaintiff's October 12, 2007, visit, PA Wilson's notes indicate that Plaintiff presented with constant, severe, sharp, throbbing, and aching low back pain that is primarily in the mid and lower lumbar spine but that radiates to the buttocks.  [R504]. On October 14, 2007, PA Wilson indicated that Plaintiff needed surgery to correct the problems.  [R224].  On an undated form that was presumably also created on October 14, 2007,[24] PA Wilson wrote that Plaintiff had been unable to work since he first saw her in March 2007, and that the symptoms and objective findings include: "Severe back pain [illegible] radiating leg pain, numbness, [illegible], Loss of Sensation R&L Lower Legs, Poor Gait, [illegible], Arreflexia."  [R221].  He later added that

---

[24]    It presumably occurred on October 14, 2007, because the form indicates that the last visit was on October 12, 2007.  [R221].

14

"[s]he needs surgery to correct her back injury," as well as: "No working @ this time[.] Cannot lift, cannot walk [illegible] a limp."  [R221].

On December 3, 2007, Plaintiff was seen by Dr. Ihenacho at the Kidney and Hypertension Center, P.C., for a social security disability physical examination, [R517], performed with the authorization of the Georgia Department of Labor, [R519].  Plaintiff reported a history of hypertension and back problems.  [R517].  Her blood pressure was 116/82.  [R517].  She walked slowly but without an assistive device.  [R518]. Neurological testing was normal, and Dr. Ihenacho stated that Plaintiff was able to take care of activities of daily living.  [R518].  Range of motion was reduced for straight leg raises and in the right foot. [R513-14].

On December 11, 2007, Dr. Sherry Crump performed a physical RFC assessment.  [R520-27].  Dr. Crump concluded that Plaintiff could occasionally lift twenty pounds; could stand, walk, or sit for about six hours per workday; could balance, kneel, and crawl frequently, stoop, crouch, and climb stairs occasionally, but could never climb a ladder, rope, or scaffolds; and Plaintiff should avoid concentrated exposure to vibration and hazardous machinery and heights.  [R521-24].  Regarding PA Wilson's conclusions that – as Dr. Crump summarized it – "claimant should not work at this time, cannot lift, cannot walk without a limp," Dr. Crump stated: "Not an

15

approved medical source.  This statement is supported by the provider's exam, but not by the CE exam.  RTC."  [R526].

On June 4, 2008, Plaintiff received a referral from the general surgery clinic at Grady Health System to the neurosurgery clinic at Grady Health System.  [R532].

On October 20, 2008, another lumbar MRI was performed.  [R539].  It showed multi-level degenerative disc disease without significant central canal or neural foraminal stenosis, along with annular tears involving the disc at L2-L3 and L4-L5, but without focal herniation of disc material through the defect.  [R540].

On forms that appear to have been completed on January 30, 2009, Plaintiff indicates that she was currently taking – among other things – Zoloft[25] for depression and hydrocodone/APAP[26] for pain.  [R563-64].  She reported that her doctor at Grady

---

[25]     Zoloft (sertraline) is used to treat depression, obsessive-compulsive disorder, panic attacks, post-traumatic stress disorder, and social anxiety disorder. *See* MedlinePlus, Sertraline, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited 03/13/11).

[26]     APAP is an abbreviation for acetaminophen (N-*a*cetyl-*p*ara-*a*mino*p*henol). *See* Merriam-Webster Medical Dictionary, APAP, http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va=sample (last visited 03/13/11).

AO 72A
(Rev.8/8
2)

Health System was "talking about operation on my next visit in 3-09 and that I need to have this."  [R561].

### C.   *Medical Records Presented to the Appeals Council* (**R565-72**)

Plaintiff submitted the following evidence to the Appeal Council: (1) a photocopy of a Georgia disabled parking permit, expiring on March 26, 2012, [R568-69]; (2) an undated, untitled, and unsigned list of medications and subjective symptoms, [R570]; (3) a form signed by PA Wilson and dated August 25, 2008, indicating that Plaintiff "is totally disabled and cannot work due to back pain," [R571];  and (4) treatment notes from Dr. Jones dated April 13, 2009, [R572].  The treatment notes: (1) reflect Plaintiff's complaint of a "flare up in her low back pain and pain that radiates down her bilateral lower extremities into the posterior thigh and calf area; (2) note "significant axial lumbar pain with flexion and extension" and "3 out of 5 motor power upon right ankle dorsiflexion and big toe extension"; (3) diagnose an annular tear and facet arthropathy at L4-5, as well as degenerative disc disease and facet arthropathy at L5-S1; and (4) prescribe "a Medrol-Dosepak for this acute flare up."  [R572].

### D.   *Evidentiary Hearing Testimony* [**R19-44**]

At the evidentiary hearing, Plaintiff indicated that she no longer had a driver's license, because it expired.  [R27].  She stated that she was unable to drive because she

17

could not feel the gas or brake pedals. [R27]. Plaintiff did not do any household chores or grocery shopping, and her husband took care of bills and other paperwork. [R28]. Plaintiff reported pain in her back, arms, and legs, and she said that she experienced this pain all day, every day. [R28]. She stated she spent part of the day lying down on her left side. [R28].

Plaintiff stated that she was taking antidepressants in November 2008. [R28-29]. She also took pain medication, blood pressure medication, and diuretics. [R29]. The blood pressure medication worked, but the pain medication did not – it simply made her feel drowsy and high. [R29]. She did not exercise or use any hot or cold applications, and she was not being treated by a psychologist, psychiatrist, or therapist. [R29]. She was prescribed Zoloft by a doctor at Grady Health System. [R29].            Plaintiff estimated that the maximum weight she could lift and carry during an eight-hour workday would be five pounds. [R30]. She had difficulty walking and had used a cane for about a year at the suggestion of her doctor. [R30]. She could walk about twenty-five feet before slowing down; she felt like something was dragging her back. [R30]. She stated that a Dr. Wilson advised her to use a wheelchair, but that she did not do this because she could not sit for long. [R30-31]. Plaintiff stated that she could not stand for more than twenty minutes at a time. [R31]. Her legs would get heavy and weak,

18

and she would limp if she began to walk.  [R31].  She also could not sit for more than twenty minutes at a time, because of burning pain in her lower back.  [R31-32].

Plaintiff also reported problems with her memory, saying that she would forget things that happened a week ago.  [R32].  When reading books, she had trouble concentrating on and understanding the words, and she could not recall what she read twenty to thirty minutes prior.  [R36-37].  Plaintiff stated that according to her doctors, she had four herniated discs in her back that are "sitting on the nerves," and some of them were torn.  [R33].  Plaintiff complained of sharp pain and pressure in her lower back, and she stated that it hurt "even when" the weather was cold, rainy, or damp, when she was menstruating, and during sex.  [R34].  On a scale of one to ten, Plaintiff rated her pain at nine and a half, and she said that it existed not only in her back but down to her legs, feet, and arms.  [R34].  The pain radiated from her back into her arms, toes, and feet.  [R34].  She also testified that she had a stiff neck, shoulder pain, and headaches, with a pain level of nine.  [R35].  She reported taking pain medication every day, and she said that "they" were talking about surgery, but she had no insurance.  [R34-35].  Plaintiff also mentioned her foot drop, saying that her foot was weak and painful all the time.  [R35-36].  She stated that she could stand to have anyone touch her leg because of the pain, and she wore light shoes because she could not wear

AO 72A
(Rev.8/8
2)

anything heavy on her feet.  [R36].  She indicated that she suffered from fatigue, bouts of crying, and depression, and that she got upset because she could not walk around like most people and could not play with her grandchildren.  [R36].

Next, a vocational expert ("VE") testified.  The VE stated that Plaintiff's past relevant work had been as a housekeeper in both a hotel/motel setting and in a dormitory, which is classified as light, unskilled work.  [R38].  The VE testified that a hypothetical person of Plaintiff's age with a similar education and work background who is restricted to sedentary work that requires no climbing, crouching, or crawling; occasional balancing, stooping or kneeling, and is able to sit and stand at will, could work as a cashier, an inspector and packer of small products, and a small products bench work assembler.  [R38-39].  The VE testified that all cashier jobs are defined in the Dictionary of Occupational Titles as light work, though a significant number of them are performed at the sedentary level –  for example, a cashier who worked in a parking lot or at an airport parking facility would have the option to sit or stand.  [R38-39].   The VE estimated that there existed 45,000 such sedentary-level cashier jobs (allowing for a sit/stand option) in the United States, with about 900 in Georgia.  [R39]. The VE also testified that a number of the small products bench work assembly

20

positions would be classified as sedentary and unskilled, stating that there were 14,600

such jobs in the United States, with 550 in Georgia.  [R39].

## III.   ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since October 18, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairment: degenerative disc disease (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

. . . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925, 416.925 and 416.926).

. . . .

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity (RFC) to perform work that does not require: exertion above the sedentary level (as defined in 20 CFR 404.1567(a) and 416.967(a)); or any climbing, crouching, or crawling; or more than occasional

21

balancing, stooping, or kneeling, and that allows the alternating of sitting and standing at will.

. . . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . . .

7.      The claimant was born on July 30, 1960 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills *See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

. . . .

AO 72A
(Rev.8/8
2)

> 11.     The claimant has not been under a disability, as
>         defined in the Social Security Act, from October 18,
>         2006 through the date of the decision (20 CFR
>         404.1520(g) and 416.920(g)).

[R10-18].

The ALJ stated that the record did not support a finding that Plaintiff has a medically determinable mental health impairment given that there are no examination or treatment records from a medical source that meet the requirements of 20 C.F.R. §§ 404.1513(a) and 416.913(a).  [R11].  He also concluded that the record did not show that Plaintiff had a mental health impairment that lasted for twelve consecutive months.  [R11].  While he acknowledged that Plaintiff's mental health history and symptoms were discussed in PA Wilson's office treatment records, there was no corroborating report from PA Wilson's supervisor, Dr. Whitehead.  [R11]. Having reviewed PA Wilson's notes and examined Plaintiff's history of antidepressant prescriptions, the ALJ found no medically determinable mental health impairment.[27]

---

[27]     The ALJ summarized PA Wilson's notes on Plaintiff's anxiety treatment as follows.  PA Wilson saw Plaintiff in June 2007 and noted that Plaintiff's anxiety disorder had been diagnosed four years prior to the visit.  [R11].  Nevertheless, PA Wilson reported in his June 2007 notes that Plaintiff was not currently being treated for anxiety.  [R11].  The ALJ noted that at the hearing, Plaintiff stated that she had not received any specific mental health treatment for depression but that she had been taking Zoloft and other medications prescribed by a physician at Grady Health System to treat that impairment.  [R11-12].  The records from Grady Health System included

23

[R11-12].  The ALJ also stated that he "cannot consider" PA Wilson's opinion "given on behalf of Dr. Whitehead and included on the October 2007 form as opinion evidence" because that form was not completed or signed by Dr. Whitehead.  [R15].

The ALJ further noted Plaintiff's claim that she had constant and debilitating back pain that radiated into her legs, and he discussed her hearing testimony, in which she described her pain and her resulting physical limitations.  [R14].  Having considered the evidence, the ALJ found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  [R14].  Turning to the medical record itself, the ALJ noted that Plaintiff was diagnosed with degenerative disc disease, but that the October 2008 MRI of Plaintiff's lumbar spine showed degenerative changes with no significant

---

patient instructions for use of Paxil (paroxetine, which is used to treat depression, panic disorder, and social anxiety disorder, *see* MedlinePlus, Paroxetine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html (last visited 03/13/11)), but the record did not include a prescription for Paxil.  [R12].  Further, the ALJ noted that the list of medications that Plaintiff provided in February 2009 states that she has been taking Zoloft for depression on a daily basis since November 2008 and that the medication was prescribed by Aggarwal Gauray; however, the record did not contain a prescription from Dr. Gauray.  [R12].

24

central canal or neural forminal stenosis. [R14]. Further, the ALJ observed that Plaintiff received treatment for back pain, including an epidural steroid injection at the L5-S1 level that reduced Plaintiff's pain from 8/10 to 0/10. [R14]. The ALJ also noted that the list of home medications provided in Dr. Ihenacho's December 2007, report included the narcotic hydrocodone, and that medication is also included on the list of medications submitted in February 2009. [R14]. The ALJ noted that Plaintiff informed Dr. Ihenacho that her pain was sometimes relieved when she took her pain medications. [R14]. The ALJ added: "In any event, the claimant's RFC accommodates her pain by limiting her to a less than sedentary level of exertion." [R14].

Next, in the context of assessing the credibility of Plaintiff's subjective symptoms, the ALJ examined Dr. Murray's treatment records, which the ALJ felt indicated that Plaintiff restricted her movement to a greater degree than would be expected for her impairment. [R15]. The ALJ summarized Dr. Murray's notes as follows. In January 2007, Dr. Murray commented that Plaintiff complained of tenderness even with light palpitation in the lower back, more than typically would be expected. [R15]. He noted that Plaintiff exhibited a lot of pain behavior. [R15]. Further, in his February 16, 2007, progress notes, Dr. Murray called into question Plaintiff's effort during her examination, stating that: (1) her manual muscle test was

25

not credible because she did not make an effort against resistance even in the upper extremities; (2) her lack of effort in that examination impacted her credibility on all her subjective symptoms; and (3) he did not have a good feeling about the outcome, because the pain of the degree she exhibited was not readily explainable.  [R15].  In a subsequent report for a February 2007 visit, Dr. Murray commented that Plaintiff's lack of motion and pain exceeded any structural findings, and he stated that he assumed that Plaintiff limited her movement because of fear avoidance and not wanting to move in certain directions.  [R15].

Following the discussion of Dr. Murray's treatment records, the ALJ noted that at the hearing, Plaintiff stated that her pain medication made her feel drowsy and high. [R15].  However, the ALJ concluded that the record does not support a finding that Plaintiff's use of pain medication more than minimally affected her ability to carry out basic work activities.  In addition, in reaction to Plaintiff's statement that she did not do any house chores, shop, or pay bills, the ALJ noted Dr. Ihenacho's indication in his December 2007 consultative report that Plaintiff was able to take care of activities of daily living.  [R15].  The ALJ gave Dr. Ihenacho's report significant weight, because

26

Dr. Ihenacho "evaluated the claimant's musculoskeletal system, and referenced laboratory tests, so his opinion is based on test results."  [R15].[28]

## IV.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities that are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

---

[28]    While he discounted much of the evidence ostensibly favoring Plaintiff, the ALJ also discounted the state agency residual functional assessments, saying the expert opinions overstated Plaintiff's capacity, "as they do not take into account the claimant's continuing and ongoing back pain."  [R15].

AO 72A
(Rev.8/8
2)

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limit his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five,

28

the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## V.     SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact

29

resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means more than a scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned

30

where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).   In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.    CLAIMS OF ERROR

Plaintiff raises the following three issues: (1) whether the ALJ properly evaluated the opinion of PA Wilson; (2) whether the ALJ erred in failing to complete a Psychiatric Review Technique Form; and (3) whether the ALJ properly evaluated Plaintiff's credibility. [*See* Doc. 12 at 1].[29, 30]  In addition, Plaintiff also notes additional evidence that was supplied to the Appeals Council. [Doc. 12 at 14].  This evidence also will be discussed below.

---

[29]    For clarity, when discussing the parties' briefs, the Court will refer to the page numbers listed in the briefs themselves, not the PDF files on the docket.

[30]    A fourth issue was also raised, [*see* Doc. 12 at 1], but it was withdrawn in the reply brief, [Doc. 15 at 2 (citing Defendant's brief, [Doc. 14], at 4, 6)].

### A.      Physician Assistant's Opinion

Plaintiff argues that while a PA is a "medical source" but not an "acceptable medical source," and while only "acceptable" medical sources may establish the existence of an impairment, evidence from other sources may be used to show " 'the severity of your impairment(s) and how it affects your ability to work,' or '[y]our residual functional capacity.' " [Doc. 12 at 19 (citing 20 C.F.R. §§ 404.1513(a), (d), (e), 416.9[13](a), (d), (e))].  Specifically, in evaluating evidence from "other medical sources," Plaintiff argues that the ALJ failed to apply the same six-factor analysis applied to the opinions of "acceptable" medical sources.  [Doc. 12 at 19 (citing Social Security Ruling ("SSR") 06-3; 20 C.F.R. §§ 404.1527(d), 416.927)].  Because the ALJ did not evaluate PA Wilson's opinion using the six-factor analysis, Plaintiff argues that the ALJ's rejection of that opinion requires reversal.  [Doc. 12 at 19-20].

The Commissioner responds that Plaintiff's statement of the law is contrary to the plain meaning of the regulation cited, which states that the Commissioner "may" consider evidence from "other" sources.   [Doc. 14 at 8 (citing 20 C.F.R. §§ 404.1513(d), 416.913(d))].  Further, the Commissioner adds that this non-mandatory consideration is not in the same regulation as that which prescribes factors for weighing medical source opinions – that regulation defines medical opinions about what a

claimant can do as those from "physicians and psychologists *or other acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s)." [Doc. 14 at 8 (citing 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)) (emphasis added)]. The Commissioner asserts that Plaintiff's citation to SSR 06-3p is misplaced, because the ruling states that only "acceptable" medical sources can provide medical opinions. [Doc. 14 at 8-9]. Further, while the Commissioner acknowledges that 20 C.F.R. §§ 404.1527(d) and 416.927(d) can be applied to opinion evidence from "other sources" despite explicitly applying only to "acceptable medical sources," the Commissioner observes that "[n]ot every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case." [Doc. 14 at 9 (quoting SSR 06-3p at *5)]. Here, the Commissioner argues that the facts do not call for an analysis of PA Wilson's opinion under the criteria used for physicians because his opinion is conclusory and directly contrary to that of three treating physicians – Drs. Brownlee, Murray, and Edwards – who thought Plaintiff at least could return to sedentary work. [Doc. 14 at 9].

In reply, Plaintiff states that to contend (as Defendant does) that an ALJ may, but is not required to, evaluate a functional opinion from a non-"acceptable" medical

AO 72A
(Rev.8/8
2)

source, is to argue that the Eleventh Circuit's longstanding general rule that an ALJ evaluate all important evidence has a special exception for PAs.  [Doc. 15 at 3]. Plaintiff further asserts that Defendant ignored three of the SSRs cited in Plaintiff's initial brief.  [*Id.* at 3-4].  The first of these, SSR 96-5p, requires ALJs to evaluate opinions from all medical sources, not merely "acceptable" medical sources.  [Doc. 15 at 4].  Next, SSR 96-8p provides that "[t]he RFC assessment *must always* consider and address *medical source* opinions."  [Doc. 15 at 4 (quotation not cited)].  Third, SSR 96-7p states more explicitly that opinions from "other sources" (which includes PAs, 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1)) also must be evaluated.  [Doc. 15 at 5]. Plaintiff acknowledges that Defendant did discuss another ruling cited by Plaintiff, SSR 06-3p, but she contends that Defendant ignored portions of that ruling explicitly stating that non-"acceptable" medical sources are important and should be evaluated, and that the six factors for weighing medical evidence in 20 C.F.R. §§ 404.1527(d), 416.927(d) apply to non-"acceptable" medical sources as well.  [Doc. 15 at 5-6]. According to Plaintiff, given these rulings, the ALJ's refusal to evaluate PA Wilson's opinion requires reversal, and the ALJ should be required on remand to evaluate

34

PA Wilson's opinion using the six-factor analysis generally applied to medical source opinions.  [Doc. 15 at 6].[31]

To establish whether a claimant has a medically determinable impairment, an ALJ must look to "acceptable medical sources," which are licensed physicians, psychologists, optometrists, and podiatrists, as well as qualified speech-language pathologists.  20 C.F.R. §§ 404.1513(a), 416.913(a).  In addition to evidence from "acceptable medical sources," an ALJ "may" also use evidence from "other sources" – including a physician's assistant – to show the severity of the impairment and how it affects the claimant's ability to work.  20 C.F.R. §§ 404.1513(d), 416.913(d). "Opinions from these ['other'] sources, who are not technically deemed 'acceptable medical sources' under [the Commissioner's] rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p at *3.  Although the factors for considering opinion evidence in 20 CFR §§ 404.1527(d), 416.927(d) explicitly apply

---

[31]     Plaintiff also adds that, while Defendant claims that *Dyer v. Barnhart*, 395 F.3d 1206 (11th Cir. 2005) (cited in Defendant's brief at 7), authorizes ALJs to ignore evidence, that rule applies only to unimportant evidence (for instance, in *Dyer*, a one-time prescription to treat a transient condition unrelated to Dyer's disability). [Doc. 15 at 6 (citing *Christensen v. Astrue*, No: 5:07cv154/RS-EMT, 2008 WL 4192718, *11 (N.D. Fla. Sept. 9, 2008))].

AO 72A
(Rev.8/8
2)

only to the evaluation of medical opinions from "acceptable medical sources," "these same factors can be applied to opinion evidence from 'other sources.'  These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' . . . ."  SSR 06-03p at *4.  The factors include: (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  SSR 06-03p at *4-5. However,

> Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case.

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because . . . "acceptable medical sources" []are the most qualified health care professionals.[] However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the

AO 72A
(Rev.8/8
2)

medical opinion of a treating source.  For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.

SSR 06-03p at *5.[32]

As Plaintiff indicates, a number of earlier SSRs – SSR 96-5p, SSR 96-7p, and SSR 96-8p – contain language that might initially appear to require the ALJ to evaluate the opinions of physician assistants.  [*See* Doc. 12 at 19 n. 106; Doc. 15 at 3-5 (citing SSR 96-5p at *2-3 ("[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . .  The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the

---

[32]    The ruling further states:

Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

[SSR 06-03p at *6].

37

Commissioner."); SSR 96-7p at *5 ("Assessment of the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record.  This includes, but is not limited to . . . [d]iagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources . . . ."); SSR 96-8p at *7 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."))].  The Court notes, however, that those earlier SSRs do not focus on non-"acceptable" medical sources, while SSR 06-03p – whose stated purpose is (in relevant part) to "clarify how we consider opinions from sources who are not 'acceptable medical sources,' " SSR 06-03p at *1 – explicitly deals with them.  *See generally id.*  Notably, that ruling states that "only 'acceptable medical sources' can give us medical opinions."  *Id.* at *2.  Nevertheless, while not all of the language cited by Plaintiff supports her position, the Court ultimately concludes that the ALJ erred in not considering PA Wilson's opinion.

Language in both the SSRs and the regulations indicates that the ALJ was required to consider PA Wilson's opinion.  The Court acknowledges that SSR 06-03p

38

makes frequent use of permissive language.  *See* SSR 06-03p at *2-4 ("In addition to evidence from 'acceptable medical sources, we *may* use evidence from 'other sources[]' . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.";  "Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and *should* be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.";  "Although the factors in 20 CFR [§§] 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors *can* be applied to opinion evidence from 'other sources.' ") (emphasis added).  But that SSR also contains non-permissive language: "Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and *a weighing of all the evidence* in that particular case."  SSR 06-03p at *5 (emphasis added).  Similarly, there exists both permissive and mandatory regulatory language.  *Compare* 20 C.F.R. §§ 404.1513(d),  404.913(d) ("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we *may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work.") (emphasis added) *with* 20 C.F.R. §§ 404.1527(b), 404.927(b) ("In deciding

39

whether you are disabled, we will always consider the medical opinions in your case record *together with the rest of the relevant evidence* we receive.") (emphasis added). The mandatory language in SSR 06-03p and 20 C.F.R. § 404.1527(b) supports the statement in SSR 96-5p that an RFC assessment

> is based upon consideration of *all relevant evidence* in the case record, *including medical evidence and relevant nonmedical evidence*, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings *in light of all the evidence*.

SSR 96-5p at *5 (emphasis added).   Further, SSR 96-8p states that "[t]he RFC assessment *must* be based on *all* of the relevant evidence in the case record . . . ." SSR 96-8p at *5 (second emphasis in original).[33]

Given the language above, the ALJ's statement that he *cannot* consider PA Wilson's opinion, [R15], is incorrect.  Under any interpretation of the regulations and SSRs cited above, it is clear that he *could* have considered PA Wilson's opinion,

---

[33]   Plaintiff also cites *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981), for the proposition that the Eleventh Circuit has a longstanding general rule that "ALJs must evaluated all important evidence." [Doc. 15 at 3].  Plaintiff is presumably referring to the Eleventh Circuit's statement that an ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Cowart*, 662 F.2d at 735 (internal quotation marks omitted).  This statement, however, was made in the context of a discussion of the ALJ's obligation "to develop a full and fair record" at the hearing.  *See id.*  It is thus not directly relevant to Plaintiff's claim.

40

wholly apart from the question whether he was *required* to.  For the reasons discussed above, however, the Court concludes that the ALJ not only could have but was required to consider PA Wilson's opinion.

The question for the Court, then, is whether this error was harmless.  *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact).  Generally, an error is harmless in a Social Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits."  *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, *4 (M.D. Fla. Sept. 29, 2010) (citations omitted); *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that an ALJ's factual error is harmless if it does not affect the ALJ's conclusion).

The Court concludes that the error was not harmless because it is unclear whether considering the opinion would have affected the ALJ's determination.  First, PA Wilson saw Plaintiff more often than any other medical source discussed by the ALJ.  Under these circumstances, PA Wilson's notes may be entitled more weight than would otherwise be accorded a non-"acceptable" medical source.  *See* SSR 06-03p ("[I]t may be appropriate to give more weight to the opinion of a medical source who is not an

41

"acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."). Second, Dr. Ihenacho's December 2007 report that Plaintiff could take care of the activities of daily living, [R518], is not necessarily inconsistent with PA Wilson's suggestion in October 2007 that Plaintiff needed surgery, [R221]. Further, PA Wilson indicated in March 2008 (after Dr. Ihenacho's report) that Plaintiff was totally disabled. [R571]. This was followed by an MRI in October 2008 showing multi-level degenerative disc disease without significant central canal or neural foraminal stenosis, along with annular tears involving the disc at L2-L3 and L4-L5, but without focal herniation of disc material through the defect. [R540]. While Dr. Jones's April 2009 notes do not indicate such a severe disability, his notes were not specifically directed at Plaintiff's work capabilities. [*See* R572]. Under these circumstances, the Court cannot conclude that the assessment of PA Wilson in issue would not have affected the ALJ's disability decision determination.

**B.     PRTF**

Plaintiff first asserts that when a claimant has a medically determinable mental impairment, the ALJ "must follow a special technique" set out in 20 C.F.R. §§ 404.1520a, 416.920a. [Doc. 12 at 20]. Plaintiff further argues that when a claimant

42

presents a colorable claim of mental impairment, "social security regulations require the ALJ to complete a PRTF, append it to the decision, or incorporate its mode of analysis into his findings and conclusions," and failure to do so requires remand. [Doc. 12 at 20 (quoting *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005))]. While acknowledging that *Moore* did not define "colorable claim of mental impairment," Plaintiff relies on the Ninth Circuit's standard, which defined a "colorable claim" as one that is not "wholly insubstantial, immaterial, or frivolous." [Doc. 12 at 21 (quoting *Dykstra v. Barnhart*, 94 Fed. Appx. 449, 450 (9th Cir. Mar. 15, 2004), and *McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973, 981 (9th Cir. 2002))]. Plaintiff argues that she met this standard because she reported being depressed (and was prescribed three anti-depressants: Zoloft, Paxil, and Lexapro), and PA Wilson noted her history of anxiety disorder. [Doc. 12 at 20-21 (citing R28-29, 37, 458, 463, 561)]. She also notes that the ALJ acknowledged this evidence, [Doc. 12 at 21 (citing R11-12)], but he neither completed a PRTF nor entered the special technique findings (about Plaintiff's activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation) in the body of his decision. [Doc. 12 at 21]. According to Plaintiff, the ALJ's opinion should therefore be reversed. [Doc. 12 at 21].

43

Defendant responds that Plaintiff has confused the criteria for establishing the existence of a medically determinable impairment with the criteria for establishing the limiting effects of the impairment. [Doc. 14 at 10]. The Commissioner argues that it is only after it is determined that a claimant has a medically determinable mental impairment that an ALJ is required to "[d]ocument[] application of the technique" discussed by Plaintiff. [*See* Doc. 14 at 10 (citing 20 C.F.R. §§ 404.1520a(3), 416.920a(e))]. While a colorable claim requires consideration under 20 C.F.R. §§ 404.1520a, 416.920a, and while those provisions require determining whether the claimant has a medically determinable mental impairment as defined in 20 C.F.R. §§ 404.1508, 416.908, the Commissioner notes that other provisions (20 C.F.R. §§ 404.1513(a), 416.9[13(a)]) forbid finding a medically determinable impairment without evidence of such from an acceptable medical source. [Doc. 14 at 11]. The Commissioner observes that the ALJ noted that the only diagnosis of mental impairment came from PA Wilson – not an acceptable medical source – and was not corroborated by any medical source. [Doc. 14 at 10]. As result of this, the Commissioner argues that the ALJ could not have found a medically determinable mental impairment, which ends the inquiry prior to triggering the duty to apply the technique mentioned by Plaintiff. [*See* Doc. 14 at 11].

44

In reply, Plaintiff states that despite Defendant's contention that the ALJ was not required to conduct the PRTF analysis because Plaintiff's mental impairment was documented by PA Wilson instead of by an "acceptable" medical source, courts have generally required only a "colorable" claim of mental impairment to trigger the PRTF requirement, and that was met here. [Doc. 15 at 7]. Plaintiff argues that the evidence established not merely a "colorable" claim but one that persisted for four years, contrary to the ALJ's contention that "the record does not show that the claimant had a mental health impairment that persisted for 12 consecutive months." [Doc. 15 at 7 (quoting R11)]. In support of this contention, Plaintiff states that she was prescribed Lexapro in May 2005, was switched to a generic version of Paxil in 2006, was prescribed Wellbutrin[34] in June and October 2007 (with even the June prescription described as a refill), and was prescribed Zoloft at least from November 2008 through February 2009, and possibly afterwards. [Doc. 15 at 7 (citing R11, 28-29, 458, 463, 473, 506, 529-30, 563, 570)]. Based on this evidence, Plaintiff argues that she

---

[34]   Wellbutrin (bupropion) is used to treat depression. *See* MedlinePlus, Bupropion, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html (last visited 03/13/11).

presented a colorable claim of mental impairment, and the ALJ erred in failing to analyze it using the PRTF technique.  [Doc. 15 at 7-8].[35]

At 20 C.F.R. §§ 404.1520a(a), 416.920a(a), the Social Security regulations state that "we must follow a special technique at each level of the administrative process," which helps to: "(1) Identify the need for additional evidence to determine impairment severity; (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to your ability to work; and (3) Organize and present our findings in a clear, concise, and consistent manner."  "Under the special technique, we must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s)."  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1) (citing 20 C.F.R. §§ 404.1508, 416.908, for what is needed to show a medically determinable impairment)).  The regulations then state that "[i]f we

---

[35]     Plaintiff – noting that where there is evidence indicating the existence of mental impairment, the Commissioner may only deny the claim after he has "made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment" – also adds that the record would contain an evaluation of Plaintiff's mental impairment from an "acceptable" medical source if the ALJ had complied with the requirement that Plaintiff's mental impairment be evaluated by a psychiatrist or psychologist.  [Doc. 15 at 8 (quoting 42 U.S.C. § 421(h))].  "The commissioner should not be heard to complain that no 'acceptable' medical source has evaluated Williams's mental impairment when the ALJ shirked his duty to secure that very evaluation," and thus the ALJ's decision should be reversed.  [Doc. 15 at 8].

AO 72A
(Rev.8/8
2)

determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section."   20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1).   Paragraph (e) is labeled "Documenting application of the technique" and provides certain rules relevant to the application of the technique, including that the ALJ's written decision

> must incorporate the pertinent findings and conclusions based on the technique.   The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).   The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).   Finally, paragraph (c) lists the "four broad functional areas in which we will rate the degree of your functional limitation" as "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."   20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

Addressing these provisions, the Eleventh Circuit has held that "where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRTF and append it to the decision, or incorporate its mode of analysis into his findings and conclusions.   Failure to do so requires remand."

47

*Moore*, 405 F.3d at 1214.[36]  As such, the remaining questions before this Court are,

first, whether Plaintiff has presented a "colorable" claim of mental impairment, and, if

so, whether the ALJ "incorporate[d] [the PRTF's] mode of analysis into his findings and

conclusions," *Moore*, 405 F.3d at 1214.

The Court finds that Plaintiff did not present a colorable claim of mental

impairment.   While the Eleventh Circuit has not yet defined what constitutes a

"colorable claim of mental impairment," courts within the Eleventh Circuit that have

addressed facts similar to the present case have found that no colorable claim existed.

*See Meadows v. Astrue*, 1:09-CV-2656-JFK, 2010 WL 3614157, * 6 (N.D. Ga. Sept. 7,

2010) (King, M.J.) (finding no colorable claim where the record contained only one

notation of depression and two notations of anxiety (listed in two treatment notes

separated by a period of almost four years), where plaintiff's primary care physician

had prescribed Wellbutrin and had listed it "a number of times" as one of plaintiff's

many medications, and where plaintiff had not sought any mental health treatment

despite alleging suicidal ideation, panic attacks, and crying spells) (citing, *inter alia*,

---

[36]   At time *Moore* was decided, the regulations required the ALJ to append
the PRTF.   Because of amendments to the regulations, however, this is no longer
required; now, all that is required is that the ALJ's written decision must incorporate
the pertinent findings and conclusion based on the technique.   *Blackmon v. Astrue*,
719 F. Supp. 2d 80, 92 (D.D.C. 2010).

AO 72A
(Rev.8/8
2)

*Sesberry v. Astrue*, No. 3:08-cv-989-J-TEM, 2010 WL 653890, *3, *5 (M.D. Fla. Feb. 18, 2010) (noting that only two notations by physicians "even hint at the possibility that Plaintiff might suffer from a mental impairment," and that while a doctor referred Plaintiff for a psychiatric evaluation and prescribed an antidepressant, "[t]here is no evidence in the record Plaintiff ever saw psychiatrist, psychologist or counselor for his asserted depression"; holding that "the ALJ's silence regarding the two medical notations and Plaintiff's testimony that he feels down is not error because this evidence, without more, does not establish a colorable claim of mental impairment"); *Kellerman v. Astrue*, 5:08-cv-373-Oc-GRJ, 2009 WL 3586554, *7 (M.D. Fla. Oct. 28, 2009) (finding no colorable claim where Prozac was listed as a current medication, where plaintiff did not mention depression at the hearing, and where plaintiff cited only one medical record relating to depression)[37]).  Here, PA Wilson's

---

[37]     In that treatment note, the plaintiff

> reported that she has been off of medication for depression for one year and she wanted to go back on it; Prozac  was prescribed and Plaintiff was directed to return in one week related to her depression.  [Almost a year later], an examiner noted that Plaintiff was taking Prozac, but the examiner did not diagnose depression, note any complaints or symptoms of depression, or note a prior history of depression.

*Kellerman*, 2009 WL 3586554 at *7.

treatment notes for Plaintiff's May 2005 visit list Lexapro as one of her current medications. [R463]. PA Wilson saw Plaintiff again in June 2007 and noted that her anxiety disorder had been diagnosed four years prior to the visit but that she was not currently being treated for it.[38] [R11, 458]. For that same visit, PA Wilson prescribed a refill of Wellbutrin, [R457, 459, 473], and noted that "[p]revious attempts at treatment have included . . . an SSRI antidepressant and Paxil," [R458]. In addition, Plaintiff stated at the hearing before the ALJ that she had not received any specific mental health treatment for depression but that she had been taking Zoloft and other medications prescribed by a physician at Grady Health System. [R12].[39] Plaintiff's October 2007 treatment notes from PA Wilson indicate she was taking Wellbutrin at the time. [R506]. Finally, the list of current medications Plaintiff provided in February 2009 states that she was prescribed Zoloft in November 2008 and was taking it once a day. [R563].

These facts are quite similar to the facts found insufficient to state a colorable claim of mental impairment in *Meadows*: the plaintiff there also suffered from anxiety

---

[38]    PA Wilson's treatment notes for Plaintiff's May 2005 and March 2007 visits, however, list "NEGATIVE" for Plaintiff's mental health history. [R460, 463].

[39]    The records from Grady Health System included instruction on the use of Paxil. [R529-30].

over a period of four years, also had been repeatedly prescribed antidepressants, and also had not sought mental health treatment.  *See Meadows*, 2010 WL 3614157 at * 6. Further, the mention of depression and anxiety in Meadows' medical records were fleeting, *see id.*, as they are here.  The Court therefore finds that these facts do not suffice to state a colorable claim for a mental impairment, and thus the ALJ was not required to either complete a PRTF or incorporate its modes of analysis into his findings and conclusions.[40]

## C.    Credibility Finding

Plaintiff argues that in evaluating the credibility of a claimant's subjective symptoms, an ALJ must consider the entire record and must articulate "explicit and adequate" reasons for the credibility conclusion.  [Doc. 12 at 22 (citing SSR 96-p; *Foote*, 67 F.3d at 1562].  Plaintiff notes that the ALJ admitted that Plaintiff's medically

---

[40]     The Court further notes that the colorable claims found in the Ninth Circuit's *Dykstra* and *Gutierrez* decisions are distinguishable from the present case.  In *Dykstra*,  the court found a colorable claim where the an evaluating psychologist had concluded that a diagnosis of conversion disorder or somatoform pain disorder might have been appropriate, and the plaintiff might have suffered from "post traumatic stress-type symptoms."  *Dykstra*, 94 Fed. Appx. at 450.  In *Gutierrez* (cited in *Moore*), the court found a colorable claim where the statement of the treating physician – who had treated the plaintiff for severe depression – did not "express any opinion that the claimant's condition will materially improve within twelve months."  *See Gutierrez v. Apfel*, 199 F.3d 1048, 1051 (9th Cir. 2000), *superseded by regulation as stated in Blackmon*, 719 F. Supp. 2d at 92.

AO 72A
(Rev.8/8
2)

determinable impairment "could reasonably be expected to cause the alleged symptoms," but he did not explain why he found those symptoms not credible to the extent they were inconsistent with the RFC finding. [Doc. 12 at 22-23]. Even were the Court to infer that the ALJ thought the medical evidence inconsistent with Plaintiff's allegations, Plaintiff argues that a claimant's statement about the intensity and persistence of her other symptoms or their effect on her ability to work "may not be disregarded solely because they are not substantiated by objective medical evidence. [Doc. 12 at 23 (quoting SSR 96-7p)]. Further, Plaintiff reiterates that the ALJ improperly summarily rejected PA Wilson's opinion, thereby undermining the credibility finding. [Doc. 12 at 23]. Finally, Plaintiff argues that because the ALJ's credibility determination was conclusory and ignored important evidence that the ALJ was required to consider, the decision should be reversed, and Plaintiff's testimony should be credited as true. [Doc. 12 at 23].

In response, Defendant reasserts that PA Wilson's opinion was properly rejected, and also argues that Plaintiff's statement that the ALJ offered no reasons for his conclusion is inaccurate. [Doc. 14 at 11-12]. The Commissioner points to the following as evidence of the ALJ's consideration of credibility: (1) he stated that he must consider subjective complaints in connection with determining Plaintiff's residual

52

functional capacity; (2) he discussed the nature of the allegations; (3) he cited medical evidence in detail, noting – for example – the statement by Dr. Murray that Plaintiff's exhibition of pain and limitation was not credible; and (4) he even included non-medical evidence, such as inconsistent statements about activities of daily living. [Doc. 14 at 12].  Thus, according to Defendant, Plaintiff's assertion that the ALJ did not explain why he found Plaintiff's symptoms not credible is simply inaccurate.  [Doc. 14 at 12].

In reply, Plaintiff states that SSR 96-7p requires PA opinions to be considered in the credibility determination, and because the ALJ did not do so, the case should be remanded for the ALJ to make a new credibility determination after weighing PA Wilson's opinion using the six-factor analysis.  [Doc. 15 at 8-9].

The ALJ has discretion in making credibility determinations after listening to a claimant's testimony, "[b]ut the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  As a result, the credibility determination cannot be "a broad rejection which is 'not enough to enable [the court] to conclude that [the ALJ] considered [a plaintiff's] medical condition as a whole.' " *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at

AO 72A
(Rev.8/8
2)

1561).  "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  *Foote*, 67 F.3d at 1562.  If the ALJ fails to explain the reasons that he discredited a claimant's testimony, the testimony must be accepted as true.  *Id.* at 1223-24.

The Court finds that the credibility determination was supported by substantial evidence.  The ALJ found that "the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  [R14].  Examining the medical record itself, he noted among other things that: (1) while Plaintiff was diagnosed with degenerative disc disease, the October 2008 MRI of Plaintiff's lumbar spine showed degenerative changes with no significant central canal or neural forminal stenosis; (2) Plaintiff received treatment for back pain, including an epidural steroid injection at the L5-S1 level that reduced Plaintiff's pain from 8/10 to 0/10; and (3) records from December 2007 and February 2009 indicate that Plaintiff was taking hydrocodone, and Dr. Ihenacho stated that Plaintiff reported that her pain was sometimes relieved when she took her pain medication.  [*See* R14-15].  Most notably, Dr. Murray's treatment records, on which

54

the ALJ relied, provide substantial evidence to support the ALJ's finding that Plaintiff's subjective reports of her pain were not credible.  First, in January 2007, Dr. Murray commented that Plaintiff complained of tenderness even with light palpation in the lower back, more than typically would be expected.  [R15].  Further, in his February 16, 2007, progress notes, Dr. Murray called into question Plaintiff's effort during her examination, stating that: (1) her manual muscle test was not credible because she did not make an effort against resistance even in the upper extremities; (2) her lack of effort in that examination impacted her credibility on all her subjective symptoms; and (3) he did not have a good feeling about the outcome, because the pain of the degree she exhibited was not readily explainable.  [R15].  Finally, in a subsequent report for a February 2007 visit, Dr. Murray commented that Plaintiff's lack of motion and pain exceeded any structural findings, and he stated that he assumed that her limiting of her movement exhibited fear avoidance and not wanting to move in certain directions. [R15].

Given the ALJ's citation to the records of Dr. Murray, it is unclear how Plaintiff believes the ALJ's determination to be "conclusory," [Doc. 12 at 23].  Further, while it is true that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work

55

may not be disregarded solely because they are not substantiated by objective medical evidence," SSR 96-7p at *1; *accord id.* at *6, such was not the case here. It appears that the ALJ did not disregard Plaintiff's statements *solely* because they were not substantiated by objective medical evidence; rather, he disregarded them because of evidence(discussed above) indicating that she did *not* suffer from the symptoms alleged. In other words, there existed not only a mere lack of substantiation of her testimony, but there also existed substantiation for the *opposite* proposition, that she in fact did not suffer in the manner alleged – hence the determination that Plaintiff's testimony was not credible.

For the reasons above, the Court concludes that substantial evidence supports the ALJ's credibility determination.

### D.   EVIDENCE BEFORE THE APPEALS COUNCIL

In her initial brief, Plaintiff notes that the new evidence supplied to the Appeals Council was not included in the certified record filed by the Commissioner. [Doc. 12 at 14]. Plaintiff indicated that if the Commissioner filed the missing exhibits "in time," Plaintiff would address them in her reply brief or at oral argument. [*Id.*]. Defendant subsequently filed a supplemental transcript that included the materials referenced by Plaintiff, and Defendant addressed these materials in its response brief. [Doc. 14 at 13].

56

Defendant asserts that the weight of all the evidence of record, including the new evidence, is not contrary to the proposition that Plaintiff can perform sedentary work. [*Id.*].  In particular, Defendant states that: (1) the evidence that Plaintiff has a disabled parking permit says nothing about disability within the meaning of the Social Security Act; (2) the unnamed, undated, and unsigned list of subjective complaints is cumulative because the ALJ already considered Plaintiff's complaints of incapacitating pain and limitation; (3) the conclusory statement by PA Wilson, in which he holds himself out as the "attending physician," is cumulative because the ALJ had already explicitly rejected PA Wilson's opinion as not from an acceptable medical source; and (4) the treatment note from Dr. Jones dated April 13, 2009, notes Plaintiff's back problems but says nothing about specific limitations, was dated three weeks after the final decision, and concerns a "flare up," so it may not even apply to the relevant period.  [*Id.*].

In reply, Plaintiff notes that: (1) in March 2008, PA Wilson certified Plaintiff as "permanently" and "totally" disabled due to back pain; (2) Plaintiff was issued a disabled parking permit that is valid through March 2012; (3) in an undated statement, she listed her seven medications (including sertraline, the Zoloft generic) and described her symptoms (pain in several places; had a limp; balance was shaky; medications caused confusion, dizziness, and drowsiness); and (4) she needs surgery but does not

have the health insurance to cover it.  [Doc. 15 at 1-2].  She also points to an April 2009 visit with Dr. Jones (a colleague of Dr. Edwards), who determined that: (1) Plaintiff had a positive discogram[41] that showed "concordant" pain at L5-S1 and L4-5, with "significant" arthropathy[42] at L4-5; (2) Plaintiff had motor weakness on right ankle dorsiflexion and big toe extension; (3) Plaintiff's seated straight leg raising was positive for non-radiating low back pain; (4) Plaintiff had "significant financial limitations" and no insurance, so testing options were very limited; and (5) Plaintiff had an annular tear at L4-5, degenerative disc disease at L5-S1, and facet arthropathy at both levels.  [Doc. 15 at 1].  Dr. Jones prescribed Medrol Dosepak (a course of steroids).  [*Id.*].

The Eleventh Circuit has held that "when a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).  Other than PA Wilson's indication that

---

[41]     A discogram is a minimally invasive diagnostic imaging that helps determine whether a specific invertebral disc may be the source of back pain.  *See* R a d i o l o g y I n f o . o r g ,   D i s c o g r a m , http://www.radiologyinfo.org/en/info.cfm?pg=discography (last visited 03/11/11).

[42]     Arthropathy is a disease of the joint.  *See* Merriam-Webster Medical D i c t i o n a r y ,   A r t h r o p a t h y , http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=Medical&va=sample (last visited 03/11/11).

AO 72A
(Rev.8/8
2)

Plaintiff was "totally" disabled (addressed above), [R571], the evidence is not helpful to Plaintiff.  First, that Plaintiff was taking sertraline on an unspecified date, [R570], does not add anything to the evidence discussed above, as the ALJ was already aware that Plaintiff was on a variety of antidepressants.  Second, the parking permit is also unhelpful, given that it is not supported by any objective medical evidence, nor is there any indication as to the basis for its issuance. *See Scott v. Astrue*, 1:08-cv-213-MP-AK, 2010 WL 916395, *11 (N.D. Fla. Mar. 10, 2010) (discounting treating physician's completion of a loan discharge application and disabled parking permit for plaintiff because they were "unaccompanied by objective medical evidence and the judgments rendered in those documents as to Plaintiff's conditions are conclusory and contradictory to her treatment notes").  Third, the Appeals Council was not required to consider Dr. Jones's notes because they pertain  to a visit on April 13, 2009, [R572], while the ALJ's decision was issued on March 26, 2009, [R5, 18].  *See* 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the

59

period on or before the date of the administrative law judge hearing decision."); *accord* 20 C.F.R. § 416.1470(b).

Finally, it is unclear how this evidence applies to Plaintiff's three claims of error. Plaintiff has stated generally that "[c]ourts must review Appeals Council evidence in deciding whether the denial of benefits is supported by substantial evidence," [Doc. 12 at 14], but she has not tied this allegation to any of her claims of error, much less has she shown (or even attempted to show) how this new evidence casts doubt upon the reports of Drs. Murray, Edwards, and Ihenacho, all of which the ALJ used as the basis for his decision. For all these reasons, the Court finds that the evidence presented to the Appeals Council – other than PA Wilson's March 2008 suggestion that Plaintiff was "totally" disabled, [R571] – does not provide a basis for reversing the ALJ's decision.

## VIII. CONCLUSION

For the reasons above, the decision of the Commissioner is **AFFIRMED IN PART** and **REVERSED IN PART**. This matter is **REMANDED** to the Commissioner for further consideration of Plaintiff's claims consistent with this Order.

The Clerk is **DIRECTED** to enter judgment for Plaintiff.

60

**IT IS SO ORDERED and DIRECTED**, this the 28th day of March, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)